IN THE MATTER OF LUMUMBA

Docket No. 53790. Submitted December 2, 1981, at Detroit.—Decided March 3, 1982.

Appellant, Chokwe Lumumba, an attorney, was assigned to represent William Talley, whose trial was scheduled for July 7, 1980, in Recorder's Court of Detroit. He was cited for contempt of court and a hearing elicited the evidence as follows. At the time of his appointment, appellant informed Talley that he might be unable to represent him at trial because of a scheduling conflict. Appellant offered to withdraw from the case and allow Talley to obtain new counsel. He further told Talley that, in the event he was unable to represent Talley at trial, someone associated with appellant would represent him. In June of 1980, appellant contacted James McGinnis, another attorney, to represent Talley at trial. McGinnis agreed to do so. However, he received the file in the Talley case only four days before the scheduled trial date, and as of the trial date had had no personal contact with Talley. Also, he was told by appellant's secretary that she had made several unsuccessful attempts to reach Talley. McGinnis appeared in the Detroit Recorder's Court on July 7, 1980. At this time he talked to Judge Vera Jones's clerk, Brenda Craft, and indicated that he was acting as a substitute counsel for appellant. McGinnis then told Craft he was requesting a continuance because he had been unable to contact Talley. According to McGinnis, Craft responded that Talley was not present, had not contacted the court, and it was her opinion that a *capias* would be issued. Craft then left and made a phone call to confirm that appellant Lumumba was out of town. According to McGinnis, Craft returned to the courtroom and indicated that she had discussed the matter with the judge. Craft then told McGinnis he could leave. McGinnis admitted that he had neither talked to the judge about his problems in locating Talley nor directly told the court he was substituting for appellant. Brenda Craft indicated that in Re-

REFERENCES FOR POINTS IN HEADNOTES
[1] 17 Am Jur 2d, Contempt § 4 *et seq.*
[2] 17 Am Jur 2d, Contempt § 25.

corder's Court it sometimes happens that substitute counsel stands in for appointed counsel. She further stated that in such circumstances the normal practice is for the substitute attorney to inform the court clerk. Later, the substitute will inform the court on the record. Appellant admitted that when he had met with Judge Jones at the final pretrial conference in January, 1980, he did not inform her that he might have a conflict. He further admitted that he had not informed the judge in open court of a potential scheduling problem, the possibility that he might obtain a substitute, or of problems in finding Talley. At the same time, however, appellant indicated that in his practice, both with the Defender's Office and as private counsel, he substituted for appointed attorneys on many occasions and, on numerous occasions, substitutes had stood in for him. He stated that he had never seen an attorney bring a formal motion in Recorder's Court for a substitution, unless the attorney was actually attempting to withdraw from the case. Appellant was held in contempt of court, Vera Massey Jones, J. He appealed.
*Held:*

1. In order for there to be a contempt, it must appear that there has been a wilful disregard or disobedience of the authority or orders of the court. The record does not reflect the wilful disregard or disobedience of the authority or orders of the court constituting contempt.

2. Trial courts do not have the power to assess costs or fines against an attorney who has acted negligently or inadvertently has violated a court rule but whose conduct has not been contemptuous.

Reversed.

1. CONTEMPT — COURTS.

> In order for there to be a contempt, it must appear that there has been a wilful disregard or disobedience of the authority or orders of the court.

2. CONTEMPT — COURTS.

> Trial courts do not have the power to assess costs or fines against an attorney who has acted negligently or inadvertently violated a court rule but whose conduct has not been contemptuous.

*Ashford, Cannon, Edison, Jarrett, Lumumba & Ottison, P.C.,* for appellant.

*Alphonso R. Harper,* for appellee.

Before: DANHOF, C.J., and BRONSON and J. H. GILLIS, JJ.

BRONSON, J. On July 24, 1980, appellant, assigned counsel for one William Talley, was found to be in contempt of court for his failure to appear on the scheduled trial date. Appellant was fined $250 by a judge of the Detroit Recorder's Court for contempt, and now appeals as of the right.

In assessing whether or not appellant was properly adjudged to be in contempt of court, the following evidence, presented at the contempt hearing, is relevant.

James McGinnis, an attorney practicing in Michigan, was contacted by appellant in June, 1980, and was asked to represent Talley on July 7, 1980. McGinnis agreed to do so. However, he received the file in the Talley case only four days before the scheduled trial date, and as of the trial date had had no personal contact with Talley. He was told by appellant's secretary, however, that she had made several unsuccessful attempts to reach Talley.

McGinnis appeared in the Detroit Recorder's Court on July 7, 1980. At that time he talked to Judge Vera Massey Jones's clerk, Brenda Craft, and indicated that he was acting as a substitute counsel for appellant. McGinnis then told Craft he was requesting a continuance because he had been unable to contact Talley. According to McGinnis, Craft responded that Talley was not present, had not contacted the court, and it was her opinion that a *capias* would be issued. Craft then left and made a phone call to confirm that appellant Lumumba was out of town. According to McGinnis, Craft returned to the courtroom and indicated that she had discussed the matter with the judge. Craft

then told McGinnis he could leave. McGinnis admitted that he had neither talked to the judge about his problems in locating Talley nor told the court directly that he was substituting for appellant.

Brenda Craft indicated that in the Recorder's Court it sometimes happens that substitute counsel stands in for appointed counsel. She further stated that in such circumstances the normal practice is for the substitute attorney to inform the court clerk. Later, the substitute will inform the court on the record.

Craft had little recollection of the circumstances of this case. She remembered McGinnis's asking her about the possibility of an adjournment. However, she could not recall the reason for the request, whether she talked to McGinnis after speaking with Judge Jones, whether she informed McGinnis that a *capias* would be issued for Talley's arrest, or telling McGinnis he could leave.

Craft stated that a *capias* was issued. However, soon thereafter, Talley appeared in court. Since no attorney was there to represent him, the trial was postponed.

Bernadette Hill, an employee at appellant's law firm also testified. She said she tried to contact Talley several times by telephone to tell him of the substitution. Finally, she sent him a Western Union mailgram, telling Talley to contact McGinnis or her about the trial. Hill did, in fact, receive a return receipt from Western Union. Nonetheless, McGinnis was unable to contact Talley before trial.

Hill further stated that she was supposed to have given McGinnis the Talley file about one month before the trial date. Due to her neglect,

McGinnis did not receive the file until approximately a week before trial.

Appellant testified on his own behalf. He said that at the time that he was appointed to represent Talley he was also representing a defendant in a murder trial in Chicago. Appellant further stated that he informed Talley that, due to the murder case, he might be unable to represent him at trial. Appellant indicated he told Talley that, in this event, someone associated with appellant would represent him. Furthermore, he said that he told Talley that if this were unacceptable, he would withdraw from the case and let Talley obtain a new attorney.

In June, 1980, pretrial motions and hearings required appellant to be in Chicago on a daily basis. Consequently, appellant contacted McGinnis, who agreed to substitute for him.

Appellant apologized for the complications which arose. He stated that he felt bad for Talley and also indicated that he knew that the court had a schedule to keep.

Appellant admitted that when he had met with Judge Jones at the final pretrial conference in January, 1980, he did not inform her that he might have a conflict. He further admitted that he had not informed the judge in open court of a potential scheduling problem, the possibility that he might obtain a substitute, or of problems in finding Talley. At the same time, however, appellant indicated that in his practice, both with the Defender's Office and as private counsel, he substituted for appointed attorneys on many occasions and, on numerous occasions, substitutes had stood in for him. He stated that he had never seen an attorney bring a formal motion in Recorder's Court for a substitution, unless the attorney was actually attempting to withdraw from the case.

Following the hearing, appellant was adjudged in contempt.

The trial court's statutory power to punish an attorney for contempt is provided for in MCL 600.1701; MSA 27A.1701. As is relevant to this dispute, this statute provides:

"Supreme court, circuit courts, and all other courts of record, have power to punish by fine or imprisonment, or both, persons guilty of any neglect or violation of duty or misconduct in the following cases:

\* \* \*

"(3) All attorneys, counselors, clerks, registers, sheriffs, coroners, and all other persons in any manner duly elected or appointed to perform any judicial or ministerial services, for any misbehavior in their office or trust, or for any willful neglect or violation of duty, for disobedience of any process of the court, or any lawful order of the court, or any lawful order of a judge of the court or of any officer authorized to perform the duties of the judge."

This statutory provision has been the source of much confusion concerning the nature of contempt proceedings and when it is appropriate to find an attorney in contempt. What causes the courts difficulty is that the statute, if literally applied, seemingly allows an attorney to be adjudged guilty of contempt where only mere negligence has been shown.

The literal definition of "contempt" precludes a finding of contemptuous behavior based on simple neglect. *Webster's Seventh New Collegiate Dictionary,* p 180 (1965), defines contempt, thusly:

"1 a: the act of despising or the state of mind of one who despises: Disdain b: lack of respect or reverence for something 2: the state of being despised 3: willful disobedience to or open disrespect of a court judge, or legislative body."

Similarly, *The Random House Dictionary of the English Language,* p 316 (Unabridged edition, 1971), states that contempt is:

"1. the feeling with which one regards anything considered mean, vile, or worthless; disdain; scorn. 2. the state of being despised; dishonor; disgrace. 3. *Law.* a. willful disobedience to or open disrespect for the rules or orders of a court (contempt' of court') or legislative body. b. an act showing such disrespect. [>L *contempt(us)* a slighting, n. use of *contemptus* scorned (ptp. of *contemnere* to CONTEMN), equiv. to *Con*-CON- + *temp*- (var. s. of *temnere* to scorn) + *-tus* ptp. ending]
"—Syn. 1. contumely. CONTEMPT, DISDAIN, SCORN imply strong feelings of disapproval combined with disgust or derision. CONTEMPT is disapproval tinged with disgust for what seems mean, base, or worthless: *to feel contempt for a weakling.* DISDAIN is a feeling that something is beneath the level of one's own dignity or is unworthy of one's notice or acceptance: *disdain for crooked dealing.* SCORN denotes derisive, open, or undisguised contempt, as for a thing thought unworthy of considerate treatment: *He showed only scorn for those who had not been as ambitious as himself.* —Ant. 1. respect.

In an apparent attempt to reconcile MCL 600.1701(3); MSA 27A.1701(3) with what is normally considered to be contemptuous behavior, the Supreme Court in *People v Matish,* 384 Mich 568, 572; 184 NW2d 915 (1971), held:

"In order for there to be a contempt, it must appear that there has been a wilful disregard or disobedience of the authority or orders of the court. Whether such a wilfulness was displayed is something we must ascertain from the record before us and, after a careful review, we conclude the record permits of no such reasonable inference."

The Court in *Matish* also stated that the power

to punish for contempt should be applied "judiciously and only when the contempt is clearly and unequivocally shown". *Id.*

In the instant case, there is no doubt that appellant was acting in violation (although possibly unknowingly) of Recorder's Court Rule 10, § 3, which requires that an appointed attorney shall personally represent the defendant, and Recorder's Court Rule 11, § 3 which requires that a stipulation, written motion, and the consent of the defendant be obtained before a substitution of attorneys is permissible.

Despite the foregoing, we see no "wilful disregard or disobedience of the authority or orders of the court" as this term is used in *Matish.* It is not clear that appellant was aware of the applicable Recorder's Court Rules. In any case, the testimony of McGinnis, appellant, and Craft, all amply support the contention that both applicable rules are routinely ignored without adverse consequences to the attorneys in question. Indeed, it appears to us upon review of the record that, had McGinnis been able to contact Talley and had the case actually gone to trial on the scheduled trial date, appellant's violations of the Recorder's Court Rules would not have resulted in his current predicament. It seems that the unfortunate results of the violations rather than the acts of violation themselves are the basis of this contempt action.

An examination of the facts of *Matish,* culled from both the Supreme Court opinion, *supra,* and this Court's opinion in *People v Matish,* 21 Mich App 238; 175 NW2d 348 (1970), convinces us that the instant case should be resolved in accordance with the ultimate disposition of *Matish.* In *Matish,* attorney Matish was associated with the Legal Aid and Defender Association of Detroit. He was as-

signed to represent Norman Thornhill. Six days before the scheduled trial date, Matish appeared in Recorder's Court. Matish was explicitly told that if he could not appear on the scheduled trial date someone else would have to appear on Thornhill's behalf and, if the case were not tried on schedule, Matish would be held in contempt. On the scheduled trial date Myzell Sowell appeared before the court and indicated that James Roberts would represent Thornhill. Neither opinion indicates where Roberts was at the time of this colloquy. In any case, Thornhill refused to accept a substitute attorney, stating on the record:

"I would be going to trial this morning with an attorney I never saw before in my life and knows nothing about my side of the case at all."

This Court found that in light of the trial court's mandatory language, it was incumbent on Matish to have resolved any potential problems with his client concerning a substitute lawyer before the scheduled trial date. The Supreme Court, as noted previously, reversed.

There are admittedly differences between *Matish* and this case. One might distinguish the cases by noting that, here, appellant never informed the trial court about the potential conflict, while in *Matish* the opposite was true. We reject this basis for reaching a result contrary to *Matish* because the record satisfies us that appellant, from past experiences in the Recorder's Court, believed that it was not necessary to give advance notice of the conflict as long as he was able to secure substitute counsel. We also note that, in one important respect, appellant is a more sympathetic figure than attorney Matish. Appellant actually did inform Talley in advance that substitute counsel might

have to be obtained and offered to withdraw if Talley wanted him to. Attorney Matish, however, never did resolve with his client how a substitution of attorneys would be viewed. The fundamental similarity between the cases is that a review of the record reveals that neither attorney willfully disobeyed a court ruling or court rule within the meaning of "contempt" as used in common parlance.

In contrast to *Matish* and this case is *In re Henry,* 25 Mich App 45; 181 NW2d 64 (1970), *lv den* 384 Mich 783 (1970). There, attorney Henry neither appeared for trial nor did he attempt to obtain substitute counsel. Henry argued that his failure to appear was inadvertent because he was unaware of the scheduled trial date. There was considerable evidence adduced that Henry had, in fact, been informed of the scheduled trial date. The trial court did not explicitly find, at least insofar as the opinion of this Court shows, that it did not believe Henry was not cognizant of the trial date. It did find, however, that Henry had been given written notice of the trial date, that the Detroit Legal News, the official paper of Recorder's Court, ran the scheduled trial date, that Henry's client was in court (it might also be added that the court clerk's affidavit averred that he had been told by defendant that Henry had told him when the case was set for trial), and that others had been able to find out the scheduled trial date. At the very least, *In re Henry* requires a finding of gross negligence reflecting bad faith on the part of an attorney who fails to appear before a finding of contempt is appropriate.

Professor B. J. George, of the Wayne State University Law School, in harmonizing *Henry* and *Matish, supra,* has said that where an attorney

makes a good faith effort to obtain a substitute lawyer for his client when the original attorney cannot appear, the failure to appear cannot be deemed willful. B. J. George, Jr., *Criminal Law and Procedure,* 18 Wayne L Rev 317, 344 (1972). It is our opinion that Professor George has correctly analyzed the dual rules of *Henry* and *Matish.* Since we believe, based on the record before us, that appellant did make good faith efforts to secure a substitute attorney who would be able to represent Talley on the scheduled trial date, we reverse the contempt conviction.

Despite the foregoing, we agree with Recorder's Court Judge Jones that appellant's behavior should not be condoned. While it does not rise to the level of contemptuous conduct, appellant's behavior in regard to this case does show a lack of good judgment.

Incredibly, the trial courts of this state are without statutory authority, and are not empowered by a rule of court, to assess costs or fines where an attorney has acted negligently or has inadvertently violated a court rule but has not acted contemptuously within the meaning of *Matish, supra.* It may be that the Legislature intended MCL 600.1701; MSA 27A.1701, to cover both cases of true contempt and mere simple negligence. However, the inclusion of a potential jail sentence of up to 30 days in MCL 600.1715; MSA 27A.1715, for a contempt, makes it rather unpalatable to construe MCL 600.1701; MSA 27A.1701, as being broad enough to cover cases of neglect. This may well have been a factor in the Supreme Court's decision in *Matish, supra,* to require willful disregard or disobedience as a condition precedent to a contempt conviction. It seems to us that the Legislature could statutorily recognize the difference

between true contempts and negligence, which nonetheless disrupts the court, and provide for fines only in the discretion of the court in the latter situation. Similarly, the court rules do not empower the lower courts to impose fines for negligence which disrupts the judicial process and which is less serious than a true contempt. Since there exists neither statutory nor judicial authority allowing the trial courts to assess fines or costs when noncontemptuous, culpable conduct, such as occurred here, is in issue, we must simply reverse.

Reversed.

J. H. GILLIS, J., concurs in result only.